IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JESUS MANUEL HERNANDEZ, VALENTIN HERNANDEZ AND JOSE VAZQUEZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>LUIS R. RIOS, DIRECTOR OF THE BUREAU OF SPECIAL INVESTIGATION OF THE COMMONWEALTH OF PUERTO RICO,<br><br>    Defendant. | CIVIL NO. 09-1074 (CVR) |

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiffs Jesús Manuel Hernández, Valentín Hernández and José Vázquez (hereafter "plaintiffs") filed a complaint against defendant for violations of their civil rights under Title 42, United States Code, Sections 1983 and 1988, and under supplemental jurisdiction which stems from some illegal and unjustified intervention by defendant when he ordered state police officers to detain plaintiffs. The events leading to plaintiffs' claims against defendant, as indicated in the Amended Complaint, and recognized by defendant as to the gist of the events that transpired on January 28, 2008, reveal that defendant Luis R. Ríos and non-defendant Sergio Rivas, with other agents, took part in an undercover operation attempting to arrest two drug traffickers in the area of the Américo Miranda Avenue near an Esso Gas Station. A confidential source and two undercover agents had participated in a drug transaction which started with a meeting near the afternoon hours and concluded with the

illegal transaction to be carried out in the night hours. At such time, the participating agents attempted to arrest the targets without a warrant but they fled the scene in a BMW vehicle and others left on foot. The agents found thereafter the BMW which had been abandoned in the street near the Puerto Rico Medical Center and two targets were arrested, while two others remained at large. Since the agents considered that some of the target individuals were on the loose, together with the confidential source, they extended the search to the next San Francisco Train Station. Once at the train station, Sergio Rivas, who was accompanied by agent Elsa Hernández, observed an individual considered to fit the target description and diffused said information by radio to all personnel, including defendant Ríos. It was observed and informed over radio also that a white van had arrived at the San Francisco Train Station and the individual previously described as one who fitted the target individual was seen boarding said white Astro van. The agents considered the Astro van was a taxi and concluded its driver had just been carjacked. However, said individual alleged to fit the target description was later identified as herein plaintiff Valentín Hernández, whose father, co-plaintiff Jesús M. Hernández, was the driver of the white van and were picking up, Valentín Hernández' stepbrother co-plaintiff José Vázquez Bernier, at the train station. Plaintiffs were never engaged in any illegal transaction.

Defendant submits that once Sergio Rivas, on board of a red Dodge Ram attempted to detain plaintiffs, they fled out of the San Francisco Train Station at high speed and a hot pursuit ensued. During the pursuit, the red Dodge Ram used by the agents and the white Astro van were involved in two accidents –which plaintiffs rather describe as being rammed by the former vehicle– until the white van flipped and all the occupants were subsequently

Jesús Manuel Hernández, et al v. Luis R. Ríos
Civil No. 09-1074 (CVR)
Opinion and Order
Page 3

removed and detained. The driver, co-plaintiff Hernández, was ordered to lean against a fence but was not considered by defendant to have been placed under arrest. Co-plaintiffs Valentín and Hernández were detained and handcuffed until the undercover agent appeared and indicated they were not the individuals who had participated in the drug transaction that was the object of the law enforcement operation at Américo Miranda Avenue. Plaintiffs were then released, sought medical attention and arranged for the recovery of their flipped vehicle, receiving an apology the following day from defendant Ríos. (Amended Complaint, Docket No. 16).

Defendant Luis R. Ríos, in his personal capacity, and as the appointed Director of the Bureau of Special Investigation, as well as supervisor of the intervening agents and a participant on the date of the events as to above, filed a motion for summary judgment. Defendant requests summary disposition of all plaintiffs' claims of illegal arrests and as to plaintiff Jesús M. Hernández' claim of use of excessive force. Defendant Ríos submits there was no such deprivation of constitutional right for the arresting agents had probable cause for the arrests and no use of force was utilized as to co-plaintiff Hernández. On the assumption that federal causes of action would be summarily disposed as requested, defendant further prays for the court not to exercise jurisdiction over supplemental state claims. In addition, defendant Ríos avers there is no supervisory liability and he should be entitled to qualified immunity. (Docket No. 54).

Plaintiffs submitted their opposition. (Docket No. 62). The parties also filed their respective statement of uncontested facts with the corresponding documents supporting their factual contentions.

The parties have consented to proceed before this Magistrate Judge for all further proceedings, including the entry of judgment. As such, this Opinion and Order follows.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. *Id*. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Id*.

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). There is "no room for credibility determinations, no room for

the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. Puerto Rico Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).  In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment."  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

## FINDINGS OF UNCONTESTED MATERIAL FACTS

### A. Defendant's Uncontested Material Facts.

Defendant Luis Ríos was the Director of the Bureau of Special Investigation in 2008 and Sergio Rivas was an agent of said Bureau from May 1998 through the date of the events. On January 28, 2008, an undercover operation which targeted individuals for the buy/sell of illegal drugs ensued at the Esso Gas Station of the Américo Miranda Avenue.  Rivas had been assigned to work in a red Dodge Ram vehicle together with one Elsa Hernández.  Two undercover agents and a confidential source were also working the deal.  Another unit of the Bureau held four agents, the tactical group, including defendant Luis Ríos, who were in a black Ford-250 Harley Davidson, and were assigned to do the arrest of the targets. (Deft's Uncontested ¶¶1-11).

When agents attempted to detain the targets of the drug activity, they fled on a BMW which was found later abandoned in the street and two suspects were arrested. The agents, as well as Rivas with Elsa Hernández driving the red Dodge Ram, extended the search of the remaining target individuals who were at large to the San Francisco Train Station.  At that time, plaintiff Jesús M. Hernández, stepfather to co-plaintiff José Vázquez arrived to pick

up co-plaintiff Valentín Hernández at the San Francisco Train Station in a white Chevrolet Astro van. Rivas observed Valentín Hernández while it was being radio diffused to all personnel that an individual with the target's description was at the train station. (Deft's Uncontested ¶¶ 11-25).

Herein defendant Luis R. Ríos, while still at the McDonald's restaurant in Reparto Metropolitano, heard over the radio that there was an individual with the target's description in the San Francisco Train Station and headed to the site in the black Ford-250 Harley Davidson with other agents. He stated having heard that in the parking lot of the San Francisco Train Station a white van had arrived and it was a taxi. Those in the black Ford-250 proceeded to carry out the arrest of the target, later identified as co-plaintiff Valentín Hernández, while he was boarding the white van. Three agents in the black Ford-250 exited their vehicle but the white van left the San Francisco Train Station at high speed for which a hot pursuit ensued. Ríos then believed the white van had fled because the target individual had carjacked its driver. (*Id.* ¶¶12-33).

Sergio Rivas chased the white van on board of the red Dodge Ram through the De Diego Avenue. Upon been bumped by the Dodge, the white van flipped on its side and crashed into the Suiza Dairy factory's fence while the Dodge Ram impacted a bus station. The agents identified themselves to those in the white van, telling them to come out with their hands up and in silence. Plaintiffs Valentín Hernández and José Vázquez were handcuffed and arrested. (*Id.* ¶¶34-41).

When plaintiff Hernández stepped out of the van he was ordered to lean against the fence. (Deft's Undisputed ¶42). Defendant Ríos gave instructions for the undercover agent

to come to scene to identify the suspects and, upon arriving, the undercover informed the agents that neither of the individuals arrested was one of the targets being sought. (*Id*. ¶¶ 43-44). Plaintiffs were released.

**B. Plaintiffs' Uncontested Material Facts.**

As relevant to above defendant's undisputed facts, plaintiffs submit additional and more detailed description as to the events depicted which give a different hue and interpretation of what had transpired. Plaintiffs Hernández and Vázquez were at the San Francisco Train Station at the time in a white Chevrolet Astro van, which had no display to consider it to be a taxi, to pick up co-plaintiff Valentín the night in question when individuals dressed as civilians were seen approaching them while displaying a Panther Caliber Rifle, with hooded mask, and giving them no signs to believe these were law enforcement agents. (Plaintiffs' Undisputed ¶¶1-11).

The first vehicle to arrive to the San Francisco Train Station was the red Dodge Ram with individuals later identified as Rivas and a driver Elsa Hernández, who gave the description of plaintiff Valentín over the radio. An order given over the radio thereafter was to place Valentín under arrest. At no time it was indicated over the radio that the white van had been carjacked. (*Id*.¶¶12-21). The F-250 Harley Davidson parked at the train station behind the white van touching bumper to bumper and plaintiff Hernández saw through his rear view mirror three individuals getting out, could not see their faces, only their eyes, for they wore masks and had black clothing, wearing no identification. Plaintiff Hernández panicked and left the location to go the closest Police Station near the Vista Hermosa area. (*Id*. ¶¶ 37-40).

Upon seeing plaintiff Valentín entering the van, Rivas began to chase it with the F-250 Harley Davidson following the van. Rivas first impacted the bumper of the white van on the right and impacted the van several times while chasing plaintiffs. He then impacted the left hand bumper of the red Dodge Ram against the right side of the white van being obvious it would gear towards the left and spin on several occasions for as to chasing cars Rivas was a certified driver. (*Id*. ¶¶22-32). The red Dodge Ram impacted the white van about three times on the rear side and when hit a third time the van went on a 360 degree spin on the road, flipped, fell on its side and impacted the fence of the Suiza Dairy. (*Id*. ¶68).

Once the white van flipped, the first person pulled out was plaintiff José Vázquez who was placed under arrest and handcuffed. The individuals waiting for him outside called him "son of the bitch" threw him on the ground and handcuffed him. Co-plaintiff Valentín came out next and the same thing happened. When Hernández finally was able to get out of the van, he was told to shut up and lean against the fence with his hands up in the air until given further orders. (*Id*. ¶¶41-45).[1] At no time these individuals identified themselves as agents, showed rotation lights nor announced they were law enforcement. (*Id*. ¶¶65-66). At no time plaintiffs knew Police officers were chasing them, instead they feared for their lives, yelling "they are going to kill us" and were attempting to get to the nearest Police Station located near Vista Hermosa. (*Id*. ¶¶69-70).

---

[1] The individuals were pointing long weapons at plaintiffs for around twenty (20) minutes, ordered them to look forward, not to them, and they all remained at the site for about one and a half hour until the individual, later identified as the undercover agent, indicated plaintiffs were not the individuals being sought.

Once Hernández came out of the flipped van, he was able to see some letters on some of the shirts of those present who also had bullet proof vests. Others had clothing which was completely black, unidentified, had masks over their faces and did not display any identification. Plaintiffs were pointed at with long weapons for about 1 to 1.5 hours. Hernández was not allowed to make a phone call even though he requested to do so. (*Id.* ¶¶46-52, 54). Plaintiffs Valentín and Hernández were kicked by the agents while on the ground, told to keep quiet or they would be shot. (*Id.* ¶¶93-94). Hernández was not put on the ground for he complained of chest pains and was then told to lean against the fence. (*Id.* ¶95). Plaintiff Valentín suffered a dislocated shoulder and was cut on the neck and chest due to cut glass on the street while he was lying there. (*Id.* ¶¶ 96-97).

It was not until later, when a masked man showed up, picked up plaintiff Valentin's head and looking at him stated he was not the individual they were looking that plaintiffs were released and handcuffs were removed. (*Id.* ¶53). The agents had been cursing at plaintiffs. Upon noticing they had made a mistake intervening with plaintiffs, the agents began to take off the licence plates of their vehicles. (*Id.* ¶¶76-77).

Defendant Ríos was the one in charge the night of January 28, 2008, as the supervisor. He was the only one not wearing a mask. Ríos provided plaintiffs, once their handcuffs were removed, a business card to their sister who showed up at the scene with his phone number and asked them to meet him in his office the following day. At the office, defendant Ríos apologized for having mistaken plaintiff Valentín with the target of an investigation. (*Id.* ¶¶ 55, 59, 78).

Plaintiffs Valentín and Vázquez went to the hospital that night while Hernández waited for a tow truck to take his white van vehicle home. Hernández visited the hospital the following day and received physical therapy for about six months, twice a week. (*Id.* ¶¶56-58). Valentín and Vázquez left the hospital around midnight on the date of the events. (*Id.* ¶¶80-81).

Defendant has not provided the description nor the photograph of the young man they had targeted and were looking for that night. Plaintiff Valentín was wearing that night a black T-shirt with blue jeans. (*Id.* ¶¶102, 120).

## LEGAL ANALYSIS

Defendant Ríos' predominant ground for summary disposition is that the participating agents had probable cause, in regards to the events that transpired on January 28, 2008, to intervene and arrest plaintiffs.

**I.    Probable Cause.**

Every arrest and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. Michigan v. Summers, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593 (1981).

For a reasonable officer to carry out an arrest "probable cause exists when the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Id.* (quoting United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir.1987)). See also Illinois v. Gates, 462 U.S. 213, 232 103 s.Ct. 2317, 2329 (1983).

Defendant Ríos is requesting summary judgment of plaintiffs' claims insofar that, at the time of intervening with plaintiffs, there was probable cause. He bases said probable cause on the arguments the co-plaintiff Valentín fitted the description of the target individual object of their undercover operation. Defendant Ríos submits we should examine the question that probable cause existed for he considers evidence was present which "warrant[s] a man of reasonable caution" into believing that a crime has been committed and the person to be arrested committed same. Defendant submits he had a good faith belief the intervention with plaintiffs on the night of the events was justified, that plaintiff Valentín was considered the target individual for whom they had probable cause for an illegal drug transaction since he fitted the description on the radio and furthermore at the time there was also a belief that the "taxi driver" of the white Chevrolet Astro van had just been carjacked, resulting in a hot pursuit and plaintiffs' apprehension.

Still, first and foremost, defendant Ríos has not provided a link between the drug trafficking events that previously transpired at the Esso Station at the Américo Miranda Avenue, the abandoned BMW car at another street, and the conclusion that plaintiffs' presence at the San Francisco Train Station was connected with the illegal activities except for a general averment that one of the plaintiffs fitted the description of the individual sought.

The standard is probable cause for the search and seizure of a person must be supported by probable cause particularized with respect to that person. Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 342 (1979).[2]

The grounds for probable cause as to plaintiffs in the instant case are devoid of any particularity or any factual development by defendant as to why the agents intervened with plaintiffs in particular, except that co-plaintiff Valentín was considered to fit the description of one of the individuals being sought. Still, except for the agents' conclusion as to the existence of probable cause, no further development, elaboration or even minimal information has been provided as undisputed facts to sustain how and why co-plaintiff Valentín even fitted said description and why probable cause was present as to said plaintiff at the train station, other than to observing him waiting to be picked up by a white Astro van, that was not a taxi and was not related to the previous illegal drug trafficking venture. There is no rational explanation stemming from any undisputed factual basis presented in the summary judgment motion nor supporting documents attached to the motion for summary judgment as to how the agents or defendant Ríos reached the conclusion that, upon boarding the white Astro van the driver, co-plaintiff Jesús Hernández, was considered to have been carjacked. Neither is there any factual basis to submit as undisputed

---

[2] Probable cause must exist with respect to each person arrested and some additional circumstances from which it is reasonable to infer participation in the criminal enterprise must be shown. United States v. Martínez-Molina, 64 F.3d 719 (1st Cir. 1995).

Jesús Manuel Hernández, et al v. Luis R. Ríos
Civil No. 09-1074 (CVR)
Opinion and Order
Page 13

defendant's conclusion there was a need for the reasonable exercise of force as means for the apprehension of plaintiffs by ramming on several occasions the white Astro van until it flipped over, more so in the absence of probable cause.[3]

This case presents significant controversies arising from omissions of material facts as to the claimed probable cause defense raised by defendant. It is not proper to resolve these controversies at the level of summary judgment, more so with the scant factual basis submitted in the summary judgment motion as to relevant information that could allow an assessment under the totality of the circumstances that could benefit defendant Ríos in regards to the existence of probable cause. Furthermore, issues of subjective interpretation of the events that transpired, gaps in communication between the law enforcement agents and the limited factual contents of the deposition testimonies by defendant weight heavily, not only as to the credibility of the facts exposed, but also as to whether the arresting officers acted as reasonable officers would have done under the totality of the circumstances.

Defendant Ríos further claims that, as to plaintiff Jesús Hernández, since he was not handcuffed at the time, he should not be considered to have been placed under arrest. Plaintiff Hernández attests otherwise, namely, that he was not free to go, he was denied making a telephone call; was ordered to stay at the fence and was to keep quiet unless ordered; was being pointed at with firearms and rifles that were displayed for some time;

---

[3] Still, whether the events could have been accomplished by less intrusive means would not render the acts of the agents as unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it. Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997) (citing to United States v. Sharpe, 470 U.S. 675, 686-87, 105 S.Ct. 1568, 1575-76 (1985).

and was held within the perimeter under control of the agents until an identification was conducted by the undercover agent who thereafter came to the scene. (Plaintiffs' App. 3, Hernández' depo. pp. 12-13, 15-16, 17-18, 19). Co-plaintiff Valentín also indicated Hernández was not handcuffed for he had complained of having chest pains at the time. (Plaintiffs' App. 5, p. 20).

An individual may be considered to be under custody when there are restrictions on a person's freedom, including freedom from movement to the degree associated with a formal arrest. Pasdon v. City of Peabody, 417 F.3d 225, 227 (1st Cir. 2005). Hence, the person is considered seized when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).

Thus, as to co-plaintiff Hernández, there are sufficient factual controversies as to this situation that do not allow to be summarily dispose resting on credibility determinations from each of the participating witnesses and the assessment as to how Hernández felt at the time in regards to his personal freedom and could have considered to be under arrest.

## II. Excessive Force.

A claim that the police used excessive force in making an arrest is one analyzed in light of the Fourth Amendment prohibition of unreasonable searches and seizure. The question is whether the force used was "objectively reasonable" under all the circumstances. Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870-71 (1989). Although not every push and shove rises to the level of a constitutional violation and one must consider that police officers in making an arrest are often forced to make split-second decisions

Jesús Manuel Hernández, et al v. Luis R. Ríos
Civil No. 09-1074 (CVR)
Opinion and Order
Page 15

about the amount of force needed to effect an arrest, the factual scenario in this case is one subject to credibility determination by the trier of facts.

The use of the red Dodge Ram to stop the alleged targets, plaintiffs' arrests, handcuffs and allegations they were also kicked by the agents and failed to receive medical treatment militate against the granting of summary judgment as to the excessive force claim for there is a controversy of facts as to the incidents leading to the arrest of plaintiffs, regardless of whether it was a mistaken identification of the participating individual.[4] An arrest infringes upon the right to be free from restraints on bodily movement. Plaintiffs have also averred in the complaint they arranged for medical treatment, as well as for the recovery of their vehicle, while defendant attempted to avoid disclosure of the license tags so that the participating vehicles would not be identified once they found a mistake had been committed.

Under the factual scenario presented in the complaint, together with the controversies of genuine issues of material facts, summary judgment of either civil rights under Section 1983, under federal law provisions, and state laws torts under supplemental jurisdiction do not warrant summary disposition.

## III. Supervisory Liability.

Defendant Ríos claims being entitled to summary disposition because there is no supervisory liability for the events that transpired. In essence, defendant Ríos claims there

---

[4] Had plaintiffs not feared for their lives as they allege and would have submitted to the seizure by the upcoming individuals observed with dark clothing and masks, the events leading to allegations of excessive force would not have ensued in all likelihood. Still, upon genuine issues of fact in controversy as to probable cause, initial intervention with plaintiffs at the train station was the initial spark for the links of events resulting in plaintiffs' claims and cannot be summarily dismissed at this stage with such factual controversies at hand.

in no *respondeat superior* under Section 1983 and supervisors must be found liable on the basis of his/her own acts or omissions or must have personally and directly been involved in causing the violation to plaintiffs' rights.

A supervisor or the head of the agency, in this case Luis Ríos as the Director of the Bureau of Special Investigation, may be found liable under Section 1983 on the basis of his own acts or omissions, but liability may not be predicated upon a theory of *respondeat superior*. A supervisor may also be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it. Plaintiffs must, however, show there is "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." Gutiérrez-Rodríguez v. Cartagena, 882 F.2d 553, 561-562 (1st Cir.1989) (*quotin*g Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598 (1976)). Plaintiffs can establish a causal link "if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Id*. *See* Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999).

In this case, defendant Ríos was the person in charge of the investigation on the night of the events on January 28, 2008. He is also identified as having admitted to the mistake the following day, from which it could reasonably be concluded defendant Ríos was the decision maker as to these events, not merely a supervisor of the participating agents. More so, Ríos was present at the site when plaintiff Valentín boarded the white Astro van and the red Dodge Ram initiated pursuit, following them in the Ford-250 Harley Davidson. Ríos is also identified as being present while the vehicle was being rammed, it flipped and

plaintiffs were placed under arrest. Defendant Ríos has not provided undisputed fact to dispel plaintiffs' contention the collision with the white Astro van was the mean to end the pursuit and, thus, exercise of excessive force. Defendant Ríos has also acknowledged giving the go ahead for the arrest of plaintiff when at the San Francisco Train Station and having the impression the driver of the white Astro van had been carjacked.

It was not until the undercover agent was requested by Ríos to show up at the site to identify the alleged targets, that plaintiffs were finally released upon the undercover agent stating they were not the individuals considered targets of the drug transaction that initiated the events the night of January 28, 2008.

In addition, there is a factual controversy on whether the agents, being supervised by defendant Ríos, conducted adequate investigation prior to the initiation of the intervention with plaintiffs. Defendant Ríos has not provided the alleged description of the targets of the original investigation, the reasonable basis from which it could be argued they had probable cause as to the commission of the crime by a particular individual except to state in general terms they observed a drug transaction and they decided to extend the search of their target individual to a nearby area. Likewise as to the belief that a carjacking had taken place when noticing the white Astro van leave the San Francisco Train Station.[5]

Defendant Ríos has not presented undisputed fact as to existence of probable cause to restrain plaintiffs' liberty in violation of their constitutional rights that would allow the summary disposition of plaintiffs' claims. All that is present is that an offense (related to

---

[5] Exhibit 2, Rivas depo., p. 31 (At no time heard over the radio the belief that the van had been carjacked).

drug trafficking) took place at another location (Esso Gas Station at the Américo Miranda Avenue); the participants eluded detention in a BMW vehicle which was abandoned; when the search for the target individual was extended; plaintiff Valentín was observed at the San Francisco Train Station while boarding a white Astro van; someone considered Valentín fitted the description (without any details as to what description was available and how plaintiff fitted same) of one of the target individuals; Ríos considered the white van was a taxi and its driver had been carjacked. This chain of events as described is not factually connected except by a subjective interpretation of defendant Ríos, without presenting undisputed issues of fact to sustain his position at the time as deserving summary disposition. (Deft's Exhibit 1 and 2).

**IV. Qualified Immunity.**

Defendant Ríos is also requesting, in the alternative to his request for summary disposition, that he be entitled to qualified immunity.

To determine qualified immunity, the Supreme Court has indicated in Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) it must first be determined whether the facts alleged show the officer's conduct violated a constitutional right. Secondly, the court will determine whether the right was clearly established so that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*. 201-02, 121 S.Ct. 2151. The Court of Appeals for the First Circuit has established in Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001)[6] how such an inquiry is divided.

---

[6] *See* Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir. 2005).

The warrantless arrest of an individual is permissible when supported by probable cause. In this case, defendant Ríos' claim for qualified immunity is grounded on his belief of having acted reasonably when detaining plaintiffs on the basis of probable cause. Still, the probable cause predicated in this case rests on factual issues which are not duly developed for all the agents who intervened with plaintiffs at the San Francisco Train Station had was some description of the individual who had perpetrated an offense and a general claim that co-plaintiff Valentín allegedly fitted said description.[7]

Furthermore, the hot pursuit of the white Astro van ensued because of an agent's belief at the San Francisco Train Station that a carjacking had taken place but no factual events as to what led to such belief, *e.g.*, whether the actions of plaintiffs were violent, a weapon had been observed, the assumed carjacked driver made any gestures or had asked for help were present and neither were these events narrated. In fact, to the contrary, one of the participating agents, Rivas, indicated no information had been sent by radio in regards to a vehicle being carjacked. Neither of these contentions, as to the grounds to establish the existence of probable cause, under the factual scenario in controversy and the information available to all participants, which defendant Ríos has failed to share with the parties or with this Court in the request for summary disposition would pass muster.[8] As

---

[7] The description of the individual and the clothing has not been shared with plaintiffs nor with the Court for all the deposition testimonies attached to the motion for summary judgment refer to is that a co-plaintiff matched the physical description and clothing of the target individual, without more (Deft's Exhibit 1, Ríos' depo., pp. 335, 36, 42); it was said over the radio an individual with the description that they had given at the McDonald's was near the milk processing factory (Exhibit 2, Rivas' depo. p. 23); Elsa Hernández ... begins to indicate over the radio that she is observing an individual with the description that have been given (*Id.*, p. 26).

[8] A determination of probable cause is a fluid concept which turns on the assessment of probabilities within the totality of the circumstances in particular factual contexts. Illinois v. Gates, 462 U.S. at 232, 103 at 2329

such, the qualified immunity requested on the general allegation the agents had probable cause, without more, is thus DENIED.

Since movant's submission for summary disposition has failed to present relevant statement of undisputed facts to allow the Court to enter judgment on defendant's behalf and as to probable cause for the warrantless arrests rests on mere allegations,[9] leading solely on speculation on whether it indeed existed, defendant Ríos' request for summary judgment is not appropriate.

## CONCLUSION

In view of the above and upon a lack of undisputed genuine issues of facts to substantiate defendant's request to summarily dispose of plaintiffs' claims, as well as other controversies of material facts, the Motion for Summary Judgment is **DENIED**. (Docket No. 54).

IT IS SO ORDERED.

San Juan, Puerto Rico, this 24th day of May of 2011.

                                                s/CAMILLE L. VELEZ-RIVE
                                                CAMILLE L. VELEZ-RIVE
                                                UNITED STATES MAGISTRATE JUDGE

---

[9] A district court looks to the totality of the circumstances in evaluating whether an arrest was supported by probable cause. United States v. Link, 238 F.3d 106 (1st Cir. 2001).